**UNITED STATES of America, Plaintiff,**

**v.**

**John A. BRENNICK, Defendant.**

**Criminal No. 95–10197–NG.**

United States District Court,
D. Massachusetts.

Oct. 1, 1996.

---

**3.** Even then, however, they made no attempt to appeal it and have not done so to date.

Robert Wolkon, Ferriter, Scobbo, Sikora, Caruso & Rodophele, Boston, MA, Terry Philip Segal, Scott P. Lopez, Segal & Feinberg, Boston, MA, for defendant.

Stephen G. Huggard, United States Attorney, Boston, MA, for U.S.

## MEMORANDUM AND ORDER
## RE: SENTENCING

GERTNER, District Judge.

## I. INTRODUCTION

On June 27, 1995, the government indicted John A. Brennick, a 59 year old man, charging him with 18 counts of failing to truthfully account for and pay over withholding taxes (26 U.S.C. § 7202.) The government also charged Brennick with 9 counts of structuring transactions to avoid currency reporting requirements (31 U.S.C. §§ 5313, 5322, 5324) for the manner in which he deposited part of the withheld but unpaid taxes in his bank

account, one count of corruptly impeding the IRS (26 U.S.C. § 7212) for those efforts which he did take to hide from the IRS that the money was being paid into his personal account, and one count of making false statements at a bankruptcy proceeding (18 U.S.C. § 152).

The indictment alleged that Brennick retained checks made payable to the Internal Revenue Service after his support staff had prepared them for the payment of trust fund taxes. At the same time, the indictment alleged that defendant had taken large amounts of cash out of the business, which he used for gambling and other inappropriate (non-business) activities, that he had multiple employer identification numbers (EINs), ostensibly to obstruct IRS inquiry into his activities, that he illegally structured the cash deposits which he withdrew from the business, and further that he made misrepresentations to the IRS concerning the reasons for his failure to pay taxes.

On December 13, 1995 the jury returned a verdict of guilty of all of the above charges, except that it failed to reach a verdict on the false statements count.

The trial had taken eight days. Sentencing was held over two days, with the voluminous trial exhibits augmented by additional exhibits and memoranda.

Brennick was the president of a number of head injury treatment centers in Massachusetts, Pennsylvania, Delaware and Maryland, as well as a bakery in Maryland. Although he had a sixth grade education, he built these companies into a multi-million dollar health care business. Notwithstanding the financial difficulties from which this prosecution arose, Brennick's treatment facilities provided, for the most part, advanced comprehensive and innovative treatment for brain injured patients. At times, the facilities provided free care to patients whose funding was depleted.

The charges in this case stem primarily from the manner in which Brennick collected his employees' payroll taxes. Brennick admits that from 1986 until 1992, it was his

practice to withhold payroll taxes from his employees, but only to pay a portion of those taxes over to the IRS. Unlike a typical tax evader, however, Brennick made little effort to deceive the IRS as to the actual amount of taxes he was required to pay. With the exception of the final quarter of 1992, Brennick "truthfully accounted" to the IRS for taxes owed, but nonetheless remitted an amount less than that indicated on the return.[1] He would keep the unremitted portion for himself for several months, at which point he would pay what was owed, along with interest and penalties. In effect, he was using the IRS as a bank, making use of the government's money, and apparently willing to pay the price for it.

His conduct, albeit illegal, is of a kind typically dealt with through civil lawsuits brought by the IRS, lawsuits which Brennick avoided by taking responsibility for the arrearages, and paying the assessed interest and penalties.

By the end of 1992, however, a number of events occurred which made it more difficult and ultimately impossible for Brennick to continue his tax payment practices as he had in the past. There were significant changes in health care reimbursement rates; the bank which had extended Brennick credit failed and the Resolution Trust Corporation, its successor, refused to make additional loans; other creditors were unwilling to make up the shortfall; costs dramatically escalated.

By October of 1992, the IRS was also aggressively pursuing Brennick for the arrearages, and threatening a lien if he did not pay them. In October, Brennick agreed to the weekly payment of a substantial amount of money to reduce the amount owed, and to remain current with respect to his existing payroll. He represented to the IRS that he would defer the executive payroll and make other changes to insure that his obligations would be met.

1. Up until September of 1992, Mr. Brennick had filed accurate payroll tax returns, all the while paying late. At that point, two quarterly returns were filed which were false: They accurately reported the amount that was owing, but they indicated that the amounts had been paid, when they had not.

Brennick spent much of the fall seeking additional lenders and refinancing in a desperate effort to save the business. At the same time, however, and notwithstanding the representations he had made to the IRS, he continued to take money out of the business, albeit less than he had before, and gambled with it. While repeatedly giving false assurances to the IRS that the debt would be paid, Brennick ultimately failed to keep up with the tax payments.

On February 8, 1993, Brennick filed for reorganization under Chapter 11 of the Bankruptcy Code. Shortly thereafter, after his creditors refused to restructure his debt, the Chapter 11 case was transformed into a Chapter 7 liquidation.

At the time of the bankruptcy filing, Brennick was in arrears to the IRS in the amount of $1,425,000.00. After the filing, he was barred from paying this prior indebtedness pending the outcome of the bankruptcy case, and thus was unable to continue his pattern of late payment with penalties and interest. He was, however, responsible for paying post-petition tax liabilities during the Chapter 11 reorganization. Over $100,000 in additional taxes were not paid during this period.[2]

Brennick and his wife now run a pizza restaurant in Brighton, Massachusetts.

At sentencing, the government recommended a sentence within the Guideline range of 41–51 months. The defendant sought a departure from the Guideline range on the ground that the Guideline calculation, driven by the calculation of tax loss, overstated the seriousness of offense.

Upon consideration of all of the facts in this case, and in particular the unusual nature of Mr. Brennick's particular form of tax evasion, I concluded that a departure was warranted. Accordingly, I departed to offense level 13, and sentenced Brennick to 13 months in prison, two years of supervised release, a special assessment of $1,450, a fine of $6,000 and certain conditions of release in addition to the standard ones. This memorandum explains my reasons for doing so.

## II. THE GUIDELINE CALCULATION WITHOUT DEPARTURE

For sentencing purposes, all the offenses of conviction are grouped under U.S.S.G. § 3D1.2. Where offenses to which different Guidelines apply are grouped together, the sentencing judge must apply "the offense Guideline that produces the highest offense level." U.S.S.G. § 3D1.3(b); *see also* U.S.S.G. § 3D1.1(a); *United States v. David*, 940 F.2d 722, 741 (1st Cir.1991), *cert. denied*, 504 U.S. 955, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992). In this case, the offense level associated with the defendant's conviction for violating § 7212(a) yields the highest offense level and therefore will be applied.

■■■ Without a departure, the Guideline calculations would be as follows: The base offense level for § 7212(a) is 18, based on the amount of the tax loss. *See* U.S.S.G. § 2T1.1.[3] To this level, I add a two-level upward adjustment pursuant to U.S.S.G. § 2T1.1(b)(2), based on a finding that the offense was committed using sophisticated means. Finally, I add another two-level adjustment for obstruction of justice, because of the defendant's testimony at trial, which I have found not to be truthful.[4] These calcu-

---

2. The bankruptcy also led to substantial problems for Brennick's employees, whose medical expenses were left unpaid by Brennick's self-funded health insurance program.

3. This is based on the Guidelines in effect at the time of the commission of the offense, namely those enacted after November 1, 1992 which were more favorable to the defendant than the Guidelines in effect at the time of the sentence.

   The defendant objected to taking into consideration the withholding taxes which were incurred after he filed for bankruptcy and which were not the subject of the indictment. I find that these

amounts can be considered as part of relevant conduct under U.S.S.G. § 1B1.3. *See also* § 2T1.1 n. 3 (1992). The defendant did not contest the fact that even after he initiated bankruptcy proceedings, he still collected payroll taxes and failed to pay them to the government. (December 6, 1995 testimony, pp. 24–25.)

4. The defendant testified that he had structured $10,000 and under $10,000 transactions, not for the purpose of avoiding the reporting requirement, but for reasons of convenience and safety. I found that this testimony was not truthful. The structuring took place in different locations, not remotely convenient to the business' operations.

lations yield an offense level of 22, resulting in a Guideline range of 41–51 months for a defendant such as Brennick who has a criminal history category of one.

## III.  DEPARTURE FRAMEWORK

### A.  Outside the Heartland

While the Sentencing Guidelines mandate their uniform application in the ordinary case, there are exceptions.[5]  *See* 18 U.S.C. § 3553(a), (b); *see also United States v. Rivera*, 994 F.2d 942, 946–947 (1st Cir.1993); *United States v. Diaz–Villafane*, 874 F.2d 43, 47–48 (1st Cir.1989), *cert. denied*, 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989). A basic principle of the Sentencing Guidelines is that "each Guideline . . . carves out a 'heartland,' a set of typical cases embodying the conduct that each Guideline describes." U.S.S.G. Ch. 1, Pt. A, intro. comment. (4)(b).

■ Where the cases within a particular Guideline fall outside of the heartland, a sentencing court may depart from the Guidelines and impose the sentence appropriate under the circumstances. *Rivera*, 994 F.2d at 947–948; *see also, e.g., United States v. Lombard*, 72 F.3d 170, 182 (1st Cir.1995).

■ In many respects, this prosecution does not represent the typical tax case, the heartland of cases envisioned by the applicable tax guidelines. As the discussion below suggests, I am therefore obliged to look to

analogous Guidelines to determine the sentence.

The payroll tax system requires employers to withhold taxes from employee's wages. They are referred to as the trust fund portion of taxes, held by the employer in trust for the government pending their payment over to the Internal Revenue service in the appropriate quarter. In addition, the employer must file an Employer's Quarterly Federal Tax Return (form 941) on the last day of the month following the close of the quarter in which the wages were paid. This system enables the government to obtain the benefits of the collection of payroll taxes without incurring the expense of administering the program. When a corporation fails to pay its trust fund taxes, the United States Treasury suffers the loss, because the employees from whose wages the amounts were withheld nevertheless are credited in full for the withheld amounts even though they were not paid over to the government.

The paradigmatic case of prosecution for failure to account for and pay over taxes, however, is civil: a company does not pay over the taxes because it is failing, because of an economic downturn; the proprietor uses the funds in question for the business expenses rather than paying them over to the government, preferring other creditors to the government. His intention is not to permanently deprive the government of the taxes owed; it is his intention to pay the IRS when the business prospects are brighter.[6]

---

Individual employees were authorized to carry substantial amounts of cash which was not safe.

In addition, defendant testified that he had met with Joel Perlman, his C.P.A., who had urged him to file two quarterly returns in July 1993, which were the only returns that were false. Mr. Perlman testified that there was no such conversation; indeed Perlman had been terminated earlier.

5.  In explaining the reach of the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 et seq., 28 U.S.C. §§ 991–998, and the Sentencing Guidelines promulgated thereunder, the Supreme Court noted:

The Act did not eliminate all of the district court's discretion, however. Acknowledging the wisdom, even the necessity, of sentencing procedures that take into account individual circumstances . . ., Congress allows district courts to depart from the applicable Guideline range if the court finds that there exists an

aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described. *Koon v. U.S.*, —— U.S. ——, ——, 116 S.Ct. 2035, 2044, 135 L.Ed.2d 392 (1996).

6.  Using the trust fund as a slush fund is one common pitfall described by one commentator as follows:

Despite the general success of the payroll tax collection system, there is always a risk that an employer will fail to fulfill its payroll tax obligations.  One reason for this is that unpaid payroll tax withholdings are an enticing source of ready cash that employers can divert to pay those persons whose goods and services are essential to the immediate survival of their businesses.  In the usual case, these employers generally do not intend to permanently deprive the government of the amounts withheld.

Typically, the government responds to failure to pay withholding taxes by initiating a civil action under 26 U.S.C. § 6672. Section 6672 provides that any person required to collect, truthfully account for and pay over any tax who willfully fails to do so, is liable to the government for the full amount of the unpaid tax plus interest and a penalty equal to the amount of the tax owed.[7] Rarely is the failure to pay trust fund taxes a criminal offense, as the Application Note to § 2T1.6 states ("The offense [violating 26 U.S.C. § 7202 by failing to truthfully account for and pay over employment taxes] is a felony that is infrequently prosecuted.").

Like other employers who have been pursued civilly under § 6672, Brennick took payroll tax monies and used them to pay his expenses. Like these other employers, he would eventually pay the taxes owed with the addition of penalties and interest.[8] And, like many such employers, he stopped paying entirely when he could no longer keep up the payments in part because financial conditions deteriorated. However, unlike the typical employer under § 6672, Brennick did not use the money he withheld from the government wholly for benign purposes, like saving his business; he gambled away a portion of it. Moreover, his profligate spending habits were—in part—responsible for the company's downfall and the final payroll tax debt.

However, while Brennick's conduct is somewhat more egregious than that of a typical civilly prosecuted employer, neither is it entirely consonant with the criminal paradigm, the "heartland" if you will, described by § 2T1.6. The Guidelines suggest that the failure to pay payroll taxes should be treated like tax evasion (commonly understood) or embezzlement.[9] Section 2T1.6 sets up a base offense level corresponding to the amount not collected or accounted for and paid over. Where, in addition to accounting to the IRS and paying over the tax, the employer collected the tax and did not "account to the employees" for it—in effect, absconding with the money, the applicable Guidelines are those under § 2B1.1 for larceny, embezzlement or theft. See § 2T1.6(b).

Brennick's actions are not consistent with either tax evasion or embezzlement. He did not embezzle trust fund monies from his employees. Until he could no longer keep up, he paid the taxes he owed, but did so late, with penalties and interest. Indeed, sometimes the payroll checks to the IRS were cut and left in a drawer until he was ready to send them in.

Nor are Brennick's actions consonant with the tax evasion paradigm, where the defendant intends permanently to deprive the IRS of the money and, typically, lies to the au-

---

Rather they intend to pay the government when business improves. Unfortunately, business often does not improve and the employers are unable to satisfy their payroll tax obligations.

Makel & Chadwick, *Lender Liability for a Borrower's Unpaid Federal Taxes*, 43 Bus.Law. 507, 508 (1988).

7. Section 6672 is used even when the evidence suggests that the failure to pay trust fund taxes is motivated by a good faith effort to save a business. *See Schwinger v. U.S.*, 652 F.Supp. 464 (E.D.N.Y.1987) (the conscious preference of other creditors over the United States constitutes willfulness under § 6672 even if the expenditures are necessary to remain in business); *Collins v. U.S.*, 848 F.2d 740 (6th Cir.1988); *Thibodeau v. U.S.*, 828 F.2d 1499 (11th Cir.1987) (it is no excuse that, as a matter of sound business judgment, the trust fund taxes were used to pay suppliers and employees for wages in order to keep the business operating as a going concern; the government cannot be made an unwilling partner in a floundering business).

8. In *United States v. Poll*, 521 F.2d 329 (9th Cir.1975), the defendant, knowing that $15,000 was owed the IRS in the first quarter of 1973, directed that payment be made of only $5,000. To accomplish this, the defendant also filed a return revealing only ⅓ of his payroll. Poll's conviction was reversed because the judge failed to allow in evidence that the corporation lacked resources to pay the amounts in question and that the defendant intended to make up the deficiencies.

Unlike the defendant in *Poll*, Brennick's returns were accurate in terms of the amount listed for payroll and the amount of taxes listed as due and owing. Moreover, Brennick's conduct, at least before the last quarter of 1992, suggested that he had every intention of making up the deficiencies.

9. "The failure to collect or truthfully account for the tax must be willful, as must the failure to pay. Where no effort is made to defraud the employee, the offense is a form of tax evasion, and is treated as such in the Guidelines." U.S.S.G. § 2T1.6 (Application Note).

thorities about the amount owed. From 1986 through the fall of 1992, Brennick collected the money, apparently with every intention of paying it over to the government, albeit late with interest and penalties. His quarterly tax returns, again until the fall of 1992, accurately listed the amounts outstanding.[10] While the situation changed dramatically after October of 1992—inaccurate returns, misrepresentations to the IRS about his true financial situation—the evidence does not suggest that Brennick sought to completely evade his obligations. His behavior was not consistent; on the one hand he was scrambling to recapitalize and refinance to save the business; on the other hand, he was still taking cash out of the business to gamble. He was finally unable to pay the outstanding amount because of a combination of circumstances, to a degree caused by him, but also to a degree beyond his control. The final bill then, he claims, is not his complete responsibility.

### B. *The Relevance of Rostoff*

■ The defendant argues that the monetary loss suffered by the government overstates the gravity of the defendant's offense, (citing language in the application note to the fraud Guidelines, U.S.S.G. § 2F1.1 (Comment n. 10) (November 1992)) and thus, the court should depart downward in this case, as the court did in *United States v. Rostoff,* 53 F.3d 398 (1st Cir.1995). What caused the 1992 loss, he claims, was a combination of business factors, and not his malfeasance. Thus, that figure, the 1992 loss, he claims, grossly overstates his culpability and the gravity of his misconduct.

The government takes the position that the fraud application note and indeed, the concept of multiple loss causation, does not apply to a tax case. No application notes under § 2T1.6 suggest any such theory. Nor does it make sense in terms of the sentencing of tax offenses. Repayment is never a defense; tax offenses are computed as of the time the

loss is incurred. Moreover, even if it did apply, the government contends, Brennick is completely responsible for the loss, his illegal and irresponsible activities—notably, taking cash out of the business for gambling, even when the business was in trouble—lead ineluctably to it.

The government is right as a general matter; the fraud Guidelines do not apply to tax prosecutions. In tax evasion cases, for example, the tax loss *is* the appropriate measure of culpability. Typically, there is a one-to-one correlation between that loss, and the amount the defendant intended to keep from the IRS.[11]

However, while appropriate in most tax cases, this framework is not entirely appropriate here. As noted above, tax evasion is not exactly analogous to this situation; the record suggests that the defendant intended to repay the amount owing. To the extent that he could not in part because of factors outside his control diminishes his culpability to the same degree as the multiple sources of loss diminishes that of a defendant in a fraud case.

No general rule is announced here—that *Rostoff* somehow applies regularly to tax prosecutions in addition to prosecutions for fraud. Rather, the unique facts of this case lend themselves to the *Rostoff* analogy.

Nor is there any question that Brennick's conduct deserves punishment; he plainly played fast and loose with the government's money, made misrepresentations to the IRS, and obstructed the IRS investigation. The enterprise of evaluating the multiple causes of the tax loss in this case is not done for the purpose of exonerating the defendant.

The question is a far more narrow one, made particularly relevant by the Guidelines' focus on the victim's loss: whether the measure of the defendant's punishment is purely quantitative—the tax loss—or whether there are other mitigating factors, namely the dire

---

10. Certain returns for the last quarter of 1992 accurately listed the amounts owed but misrepresented that they had been paid.

11. U.S.S.G. § 2T1.1 (note 6, background). As the court noted in *United States v. Clements,* 73

F.3d 1330, 1339 (5th Cir.1996) (".... 'tax loss' evaded means the tax deficiency assessed, exclusive of interest and penalties, rather than the amount the IRS could actually recover.")

straits of Brennick's companies, caused in part by forces beyond his control, not taken into account by the Guidelines.

### 1. *The Fraud Analogy*

In cases involving fraud, the Guidelines direct courts to determine the monetary loss caused to the direct victim by the defendant's criminal conduct, under a theory that the amount of loss generally serves as an appropriate proxy for the gravity of a defendant's offense, *see* U.S.S.G. § 2F1.1(a); *United States v. Rostoff,* 53 F.3d 398, 405 (1st Cir. 1995).

The Guidelines use the amount of loss as a proxy for the seriousness of the offense. However, recognizing that no proxy is perfect, the fraud Guidelines caution that "[i]n a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense." U.S.S.G. § 2F1.1 (comment 10) (November 1992).[12]

In *Rostoff,* the First Circuit affirmed a departure downward from the Guideline Sentencing Range (GSR) on the theory that the harm attributed to the defendants as measured by the amount of loss sustained by the victim, overstated the seriousness of the offense of conviction. The defendants' circumstances—and the *Rostoff* Court's reasoning—are instructive.

The *Rostoff* defendants had engaged in bank fraud and, ultimately, the loans procured resulted in significant losses. The district court granted the defendants' requests for downward departure, keying its decision to a finding that numerous economic factors, quite apart from the defendants' own conduct, had inflated the loss to the victim (the FDIC), that "economic forces not under the control of, or precipitated by, the defendants ... increased the magnitude of the losses." *Rostoff,* 53 F.3d at 405.[13] The First Circuit upheld the departures. In so deciding, the *Rostoff* Court noted that departures on these

grounds—also known as the theory of "multiple loss causation"—were permissible, indeed, even considered encouraged grounds for departure under the Guidelines. *Rostoff,* 53 F.3d at 406 (citing *United States v. Rivera,* 994 F.2d 942, 948 (1st Cir.1993) ).

### 2. *Application*

The issue then is the extent to which the defendant's misconduct and/or other factors, not within his control, were responsible for the final tax loss. To evaluate that question requires first, a review of the defendant's conduct during the heady years of his companies, when the businesses were viable, when taxes were paid late, but paid with interest and penalties, and when he took large amounts of cash from the business, apparently without negative impact; second, a review of the last quarter of 1992, to determine whether the defendant's conduct changed with respect to the payment of taxes, or his cash withdrawals, the external factors at work on his business unrelated to his conduct or misconduct, and to what degree his misconduct exacerbated the problem.

#### a. *1988–1991*

From 1988 to 1991 the defendant conducted his business the same way as he had in 1992—no more nor less culpably. He made substantial cash withdrawals, indeed far more substantial than those in 1992. *See* Tr.Ex. 108. He was a sole proprietor; he was entitled to make those withdrawals. He filed personal tax returns and paid personal income taxes.[14]

He took out $1,413,985 in 1990, and roughly $1,261,750 in 1991. Presumably, he was also gambling with the substantial amounts of money; Brennick admits that he was gambling for years prior to 1992. There is no suggestion that his behavior was new.

At the same time, he was regularly paying withholding taxes, and filing accurate returns

---

12. While the Court in *Rostoff* was addressing application note 11 in connection with the original version of the note, the analysis applies as well to the 1992 version of the note.

13. The district court in *Rostoff* also based its decision on two factors not present here—the role of the ostensible victims in precipitating the fraud and in becoming its willing participants.

14. The government maintained in its sentencing memoranda that Brennick listed the amounts he withdrew as "borrowed funds." It offered no support in the record for this position and, therefore, I can draw no such conclusion.

for both. Tr.Ex. 152. Overall, from 1990 to 1992, he paid over $10,111,801.96 in withholding taxes. Tr.Ex. 216. His method of payment was fairly consistent and without a doubt, consistently wrong: He would pay some over, and the remainder late; as to the late taxes, he would pay the interest and penalties. For instance, in 1990 he paid $107,729 in interest and in penalties. In 1991, he paid $291,248 in interest and penalties. Tr.Ex. 152, 216.

There was no correlation between Brennick's withdrawal of cash, and the late payment of taxes. That is, Brennick did not take the money he was temporarily keeping from the government and specifically use it to gamble. Nor was there any evidence that the cash withdrawals were the reason why he did not pay the payroll taxes in a timely fashion.

#### b. *October 1992*

On October 30, 1992, an IRS agent met with Brennick to discuss unpaid withholding taxes of the Head Injury Recovery Associates, one of Brennick's businesses. While Brennick voluntarily and accurately disclosed the outstanding tax liabilities of all of his businesses, he also made certain misrepresentations—e.g. that he would defer executive compensation and that repayment of the IRS would be his first priority. A payment plan was arranged to reduce the arrearage and at the same time, to keep current on outstanding payroll taxes. Although he paid almost one million dollars in order to catch up, by early 1993 it was clear that the business was failing and bankruptcy was inevitable.

Based on the testimony of witnesses at trial, and the additional submissions at sentencing, I cannot say that Brennick's misconduct—his failure to pay taxes, his gambling, his cash withdrawals—was the sole cause of the downfall of the company and the resulting unpaid debt to the IRS. Other things being equal, his misconduct would not have led to the loss in this case, standing alone.[15] Other factors acting in concert with his misconduct created the financial meltdown in late 1992 and early 1993.

There were dramatic changes in federal and state health care reimbursement structures. Brennick was unable to secure additional credit and refinancing of his existing debt, a level of debt that, while substantial, had never hindered his ability to keep his business competitive prior to that year.[16] The business spiraled downwards, resulting in Brennick's filing bankruptcy under Chapter 11 in the hopes of reorganization; the petition ultimately was converted to a Chapter 7 liquidation.

#### (1) *Failure of Credit*

Terry Cady of Heller Financial, a government witness, testified that Brennick paid Heller $40,000 in August 1992, to review his business with a view to Heller's loaning $12 million, secured by Brennick's receivables.

---

15. The government notes that Brennick had admitted squandering $1.1 million on casino gambling during 1992. Had that been paid over to the government, it argues, Brennick's payroll tax obligation would have been satisfied.

The comment is true on its face, but does not fairly represent all of the circumstances. First, the $1.1 million figure was apparently a very rough estimate as to the amount of Brennick's losses. Brennick had no records, nor did the casinos he attended. Moreover, the evidence is that these gambling losses decreased as Brennick's business situation deteriorated. At the same bankruptcy proceeding in which he admitted to the gambling losses, Brennick indicated that loss in the three months prior to the bankruptcy filing were smaller than in the earlier part of the year.

While it is fair to say that Brennick had a gambling problem and squandered millions of dollars (most of which he was perfectly entitled to spend), it is not a fair conclusion that the government lost what it did solely *because of* Brennick's gambling. Rather, Brennick's gambling appears to have been part of a larger pattern of poor financial judgment which, combined with bad luck and changing economic circumstances, led to the collapse of his business. The collapse was an outcome which did not benefit Brennick and which he could not have intended. Yet it was this collapse which was the direct cause of Brennick's failure to pay the taxes at issue here (either on time or late with a penalty), and which explains the magnitude of the government's loss.

16. While he had been carrying substantial losses prior to that point, those losses were covered by his substantial loans extended between 1986 and 1992. By 1992, between the changes in the real estate market and the changes in the health care industry, Brennick faced a crisis.

Mr. Cady also testified that a portion of the $12 million Heller loan would be used to pay unpaid withholding taxes.

Meritor Bank, which held a $6.7 million maturing loan, was closed by the FDIC in December 1992, making it impossible to extend or roll over the loan. Without that rollover Heller would not proceed on its own.[17]

### (2) *Changes in the Health Care Market*

The shift to managed care in 1992 substantially changed the outlook for Brennick's business. Insurers paid more slowly and for fewer patient days. Accordingly, Brennick scrambled to get additional credit from other sources, wealthy individuals, business associates to cover the mounting debts, and, the record suggests, to pay his outstanding tax debt.

### (3) *Bankruptcy Proceeding*

His efforts to recapitalize, the businesses failing, Brennick filed for Chapter 11 bankruptcy. His bankruptcy lawyer, William Dolan, Esq. of Brown Rudnick Freed & Gesmer, testified that this too was unavailing: the switch to managed care, the economy, the stigma of Chapter 11 and the inability to speed up receivables caused the Chapter 11 reorganization to fail. Shortly thereafter, the businesses were liquidated.

### (4) *Brennick's Misconduct*

The government argues that the consequences suffered in 1992 logically flowed from Brennick's personal and business practices and that he therefore should be held responsible for the full amount of the loss. To be sure, while Brennick made some changes in his practices, and reduced the amount he drew from the business,[18] it is clear that he failed to alter his conduct sufficiently to meet the new financial realities of both the health care and the banking industries. His method of paying payroll taxes made the government much more vulnerable to being left high and dry. Moreover, his management of his businesses may well have made him more vulnerable to the market problems of late 1992. In that respect, his situation is like that of the fraud defendant, whose misrepresentations about his income, or the presence of a second mortgage on a given mortgage, made the lending bank more vulnerable to economic downturns. The defendant is culpable, but the culpability cannot be measured with any degree of precision by the loss figure.

In addition, the government suggests that Brennick's illegal structuring of cash deposits also contributed to the government's loss. The relationship between the defendant's structuring and the failure to pay the 1992 taxes is, at best, tenuous. As an initial matter, most of the structuring charges stem from conduct occurring in 1991. The structuring in that year—and prior—had no impact on the pattern of tax payment as I have described it; that is, while Brennick structured various deposits, ostensibly to avoid reporting requirements, he was, in fact, accurately reporting his personal income and his payroll tax liability, and paying the withholding taxes—late and with penalties and interest.

Brennick was charged with engaging in structuring through October of 1992. In addition, the government introduced evidence of structuring transactions in November and December of 1992, amounting to a total of $250,000. On the one hand, as noted above, the defendant drew less from the business in 1992 than he had in the years prior to that point. On the other hand, whatever amounts

---

**17.** To be sure, Heller also mentioned a concern about providing Brennick's businesses with a chief financial officer, and taking Brennick out of the financial helm. Nevertheless, the issues with which they were most concerned are those described above, the amount and nature of the debt, and the nature of the health care market. As Mr. Cady wrote about one of the head care recovery centers:

> Shrim [sic] is an excellent operator of head trauma patients. Its margins are a remarkable 30 to 50% of net income. It has however used new debt capital poorly. It had nearly $23.4 mm in total debt that could be paid off in less than 3 years. The debt is however all secured with extensive side security, guarantees, and incredibly short term balloon payments that could cause the company to default as early as 9/30/92....

Tr.Ex. 214.

**18.** For the entire year, Brennick took $704,450 as compared with $1,413,985 in 1990 and $1,261,750 in 1991.

he drew from the business in the fall of 1992 were critical; he had represented to the IRS that he would defer executive compensation; the business was clearly failing.

The issue is not whether Brennick should be punished for his misconduct during this period. He clearly should. The issue is whether or not the total amount of loss is an accurate proxy for his degree of culpability. It is not. The amount at issue, while important, constituted a very small amount in relation to overall tax liability.

### C. *Amount of Departure*

■ The fact that I have concluded that a departure is warranted does not address the amount of that departure. I am mindful of the fact that one purpose of the tax guidelines was to increase the penalties for tax offenders. The Federal Sentencing Commission was especially concerned about the fact that most first time tax offenders received probation, regardless of the extent of their offense.

I have concluded that a departure to a level 13 is fair and reasonable under the circumstances. Brennick will be punished by 13 months in prison, a fine and other restrictions. His business is gone. He remains liable under § 6672 for every penny of the outstanding debt; he is obliged to pay it off with whatever money he earns from whatever source.

The government has suggested that it is unfair to reward the defendant for his tax misconduct by departing downward. I do not consider this disposition a reward by any means. It is punishment for his offenses, appropriate to the circumstances.

**SO ORDERED.**